# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **LENORA RODRIGUEZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 18-CV-0666-CVE-JFJ** |
| ) | |
| **ZURICH AMERICAN INSURANCE** ) | |
| **COMPANY, and** ) | |
| **WPX ENERGY SERVICES COMPANY, LLC** ) | |
| **ERISA WELFARE BENEFIT PLAN,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

Now before the Court is plaintiff's challenge to a denial of benefits. Plaintiff filed this action

seeking to recover benefits and enforce her rights under the Employee Retirement Income Security

Act of 1974, 29 U.S.C. § 1101 et seq. (ERISA). Dkt. # 78, at 5. Defendant Zurich American

Insurance Company (Zurich) denied plaintiff's claim for accidental death and dismemberment

benefits under her husband's WPX Energy Services Company, LLC ERISA Welfare Benefit Plan

(the Plan), after her husband's fall on ice and subsequent amputation of his leg and ultimate death.

Id. at 5-7. Zurich argues that its denial of benefits was not arbitrary and capricious because

plaintiff's loss was not insured. Dkt. # 81, at 1-2.

## I.

## Background

Plaintiff's deceased husband, Luis Rodriguez (decedent), had been employed by WPX

Energy Services Company, LLC (WPX), which provides its employees benefits under the Plan. Dkt.

# 78, at 7-8. One such benefit was coverage for accidental death and dismemberment, pursuant to

Zurich policy number GTU 4848462 (the Policy) issued to WPX. Dkt. # 55, at 1-30. Zurich is the administrator and insurer of the Plan. Dkt. ## 78, at 6; 81, at 2 (explaining Zurich's dual role). Decedent subscribed to the Plan, and paid premiums for $1,000,000 coverage for accidental death and $500,000 coverage for accidental dismemberment under the Policy. Dkt. # 78, at 12. What follows is a background of decedent's medical history prior to his fall, his medical record after his fall, and the administrative history of this claim for benefits.

### A.  Decedent's Medical History Prior to His Fall

On September 28, 2017, Alfred M. Habel, M.D., an independent medical examiner hired by Zurich, provided a detailed account of decedent's medical history prior to his fall. The Court has compared his medical record review to the medical records in the administrative record (which date from 2013 to date of death), and finds that Dr. Habel's review is supported by the medical records. The following is a summary:

Decedent had a kidney transplant in 2005. Dkt. # 55, at 148; 647. Robert Hauger, M.D., internal medicine specialist (decedent's primary care physician, see id. at 1560), referred decedent to John R. Hood, M.D., gastroenterologist, for evaluation on January 23, 2013. Id. at 146; 2712. During his visit with Dr. Hood, decedent was diagnosed with hypertension, esophageal reflux, colonic diverticulosis [colon disease], diarrhea, hyperlipidemia [a high concentration of fats in the blood], and diabetes mellitus. Id. at 146; 2713.

On July 29, 2013, decedent was evaluated by Gregory A. Hill, D.O., cardiologist, for his history of chest pain, along with his underlying peripheral vascular disease. Id. at 147; 1947-49. There was concern that his symptoms were due to a cardiac etiology [cause]. Id. at 147; 1948.

Decedent was admitted to the hospital due to chest pain on October 8, 2013  Id. at 147-48; 645, 647.  He had diarrhea likely related to cytomegalovirus [CMV] positive serologies [blood tests] and likely CMV colitis [inflammation of the colon], type 2 diabetes mellitus, hypertension, and metabolic acidosis due to the diarrhea.  Id. at 147; 645.  Decedent was discharged from the hospital on October 16.  Id. at 147-48; 645.

Decedent was evaluated by cardiologist Dr. Hill on November 21, 2013, after his hospital stay.  Id. at 148; 1944.  It was noted that decedent had a type two myocardial infection related to diarrhea, viral illness, and profound anemia.  Id. at 148; 1944.  He had been treated and received blood transfusions.  Id.  He was then assessed by Dr. Hill to be in stable condition.  Id.

Decedent was admitted to the hospital on November 26, 2013, and was seen by Jeremy B. Moad, M.D., pulmonologist, in medical intensive care.  Id. at 148-49; 549, 551.  Dr. Moad evaluated decedent as being chronically immunosuppressed from his 2005 kidney transplant.  Id. at 148; 551. Over the prior twenty-four hours, decedent had become "agitated, combative[,] [had a] decreased level of consciousness[,]" and was encephalopathic [a brain inflammation condition].  Id.  He had been brought to the emergency room by his wife.  Id.  Dr. Moad noted that decedent did "not meet any sepsis criteria, although he is immunosuppressed and this can significantly mask his presentation." Id. at 553.

That same day, decedent had an infectious disease consultation with Debra L. Murray, M.D., infectious disease specialist and internist, and was diagnosed as being immunosuppressed with encephalopathy.  Id. at 149; 554-57.  Diptesh Gupta, M.D., nephrologist, then saw decedent and diagnosed him with endstage renal disease, diabetes, obesity, hyperammonemia, and ascites [accumulation of fluid in abdominal cavity].  Id. at 149; 558-59. Decedent's primary care physician,

Dr. Hauger, opined that the hepatic encephalopathy was due to cirrhosis and abnormal buildup of fluid in his abdomen with concern of infection.  Id. at 149; 561-62.  A liver ultrasound, performed on December 4, 2013, showed a cirrhotic liver.  Id. at 149; 618.  There was a concern of cholelithiasis [gallstones]. Id. at 150; 618.  Decedent was discharged from the hospital on December 9.  Id. at 148-49; 549.

Dr. Hauger evaluated decedent on December 19, 2013. Id. at 150; 512.  Plaintiff had reported that decedent was having "more shaking episodes."  Id. at 150; 514.  Decedent "became less responsive and more confused," and was assessed to have acute worsening of his hepatic encephalopathy.  Id. at 150; 514-15.

Decedent was referred by his primary care physician, Dr. Hauger, to be evaluated by gastroenterologist Dr. Hood on January 21, 2014, who diagnosed decedent as having liver cirrhosis secondary to non-alcoholic steatohepatitis.  Id. at 150; 2716.  Decedent was on dialysis.  Id. at 150; 2716.

Decedent was again admitted to the hospital on May 23, 2014.  Id. at 150; 478.  He was admitted in a confused state.  Id. at 484.  Decedent was still on dialysis.  Id. at 151; 480.  It was noted that his past medical history included cirrhosis secondary to nonalcoholic steatohepatitis with hepatic encephalopathy, renal transplant, end-stage renal disease with dialysis, type 2 diabetes mellitus, hypertension, hyperlipidemia, and coronary artery disease.  Id. at 151; 1131.  Decedent was discharged from the hospital on May 25, with a discharge diagnosis of acute hepatic encephalopathy secondary to a urinary tract infection.  Id. at 150; 1129.

On August 15, 2014, decedent spoke with his primary care physician, Dr. Hauger, about long-term disability (LTD) from WPX, and requested it in December 2015.  Id. at 151, 176-221.  In

his request, he stated that he had "extreme daily fatigue due to liver failure and kidney failure; I'm on dialysis 3 times a week which takes up most of the day." Id. at 179. He noted that he could drive only two to three miles at a time. Id. He could walk only one-half of a mile, and for not more than thirty minutes at a time. Id. He noted that his physician recommended that he not return to work until he had liver and kidney transplants. Id. at 180.

Decedent was admitted to the hospital on January 8, 2015. Id. at 152; 1560. Decedent was admitted to the intensive care unit for "life-threatening hyperkalemia [higher than normal potassium level]," presumably due to his chronic kidney disease. Id. at 152; 1561. He had been admitted after falling in the shower and striking his head. Id. at 152; 1566. Decedent was discharged from the hospital on January 14. Id. at 152; 1560.

Decedent was again admitted to the hospital on March 11, 2015. Id. at 152; 1745. The discharge summary noted a diagnosis of hypokalemia, end stage renal disease, and general weakness. Id. at 152; 1745. His potassium level was replaced and he was put on dialysis. Id. at 152; 1746. Decedent was discharged from the hospital on March 12. Id. at 152; 1745.

Cardiologist Dr. Hill saw decedent on August 27, 2015, for his peripheral vascular disease. Id. at 153; 1950. From a cardiac standpoint, decedent was doing well and was not experiencing chest pain. Id. Decedent was undergoing evaluation for a kidney and liver transplant. Id.[1]

Frank Schmidt, Jr., M.D., thoracic surgeon, evaluated decedent on November 29, 2016, and then again on December 7. Id. at 153; 1920, 1965. It was noted that decedent had coronary artery disease with cardiac catheterization on November 3. Id. at 153; 1977. He was being evaluated for

---

[1]     The administrative record states that decedent was undergoing evaluation for a "heart and liver transplant." Dkt. # 55, at 1950. However, all other records show that decedent was undergoing evaluation for a kidney transplant and a liver transplant, not a heart transplant.

kidney and liver transplants when the coronary artery disease was diagnosed.  Id. at 153; 1925.

Decedent had a body mass index of 37.12.  Id. at 153; 1923.  It was noted on December 7 that

decedent had diabetes mellitus, "which would increase the risk of wound complications" and would

require a perioperative insulin drip.  Id. at 153; 1924.  It was also noted that his obesity would

increase the risk of wound complications.  Id.

### B.  The Fall, Subsequent Amputation, and Death

On December 17, 2016, decedent suffered a fractured leg and ankle after slipping on ice

while plugging in Christmas lights on his porch.  Dkt. # 78, at 6, 8.  The loss description states that

"LUIS WAS UNAWARE THAT FROZEN MIST HAD ACCUMULATED."  Dkt. # 55, at 121.

Decedent was admitted to the hospital on December 17.  Id. at 154; 1141.  Farishid Zandi,

M.D., internal medicine specialist, evaluated decedent on December 18 and noted that the fall caused

head trauma, but no loss of consciousness.  Id. at 154; 1846, 1854.  He required intravenous pain

medication, orthopedic consultation, and cardiology consultation.  Id. at 154; 1845.  Surgery was

conducted on December 20, id. at 154, 157; 1400, with diabetic sliding scale insulin to be provided.

Id. at 154; 2675.  At this time, his body mass index was greater than thirty-nine.  Id. at 154; 2671.

On December 20, decedent had an operative procedure to externally fixate his tibia fracture

and his ankle fracture.  Id. at 126, 157; 2661-65.  Decedent was discharged from the hospital on

December 23.  Id. at 154; 1141.  The discharge diagnosis was "an ankle fracture and tibial plateau

fracture, cirrhosis due to nonalcoholic steatohepatitis, renal transplantation with chronic kidney

disease, on dialysis, type 2 diabetes mellitus, morbid obesity[,] and coronary artery disease."  Id. at

154; 234.  Decedent was admitted to a skilled nursing home on December 23, 2016.  Id. at 223.

Decedent developed clostridium difficile [bacteria that causes inflammation of the colon] while at

the nursing home.  Id. at 157; 1393, 1341 (showing that decedent had been prescribed Vancomycin, a drug used to treat clostridium difficile).

On January 5, 2017, decedent was admitted to the hospital.  Id. at 155; 1211.  An open reduction and internal fixation of the left tibial plateau was performed on January 6, and decedent had a left ankle adjustment of the external fixator.  Id. at 126, 155; 1212.  The surgery went well. Id. at 155; 1212.  He underwent physical therapy, hemodialysis, and blood transfusions.  Id.  During his hospital stay, the doctors removed the left knee external fixator with irrigation and debridement of the left femur and the external fixator pin sites.  Id. at 155; 1243.  Decedent's diagnosis was:

> Displaced bicondylar fracture of left tibia, subsequent encounter for closed fracture with routine healing, [u]nspecified fracture of shaft of left fibula, subsequent encounter for closed fracture with routine healing, [a]llergic rhinitis, unspecified, [a]nemia in chronic kidney disease, [a]therosclerotic heart disease of native coronary artery without angina pectoris, [c]onstipation, unspecified, [d]ependence on renal dialysis, [d]iarrhea, unspecified, [d]isplaced bicondylar fracture of unspecified tibia, subsequent encounter for closed fracture with routine healing, [e]ncounter for preprocedural cardiovascular examination, [e]nd stage renal disease, [g]as pain, [h]eartburn, [l]iproprotein deficiency, [n]onalcoholic steatohepatitis (NASH), [o]besity, unspecified, [o]ther specified health status, [p]ain, unspecified, [p]eripheral vascular disease, unspecified, [p]ressure ulcer of sacral region, stage 2, [t]ype 2 diabetes mellitus without complications, [u]nspecified cirrhosis of liver, [v]itamin deficiency, unspecified.

Id. at 250.

He was discharged on January 17, but was readmitted to the hospital later that evening with a fever, hypotension, and confusion.  Id. at 155-56, 127; 1310.  Plaintiff reported that decedent had been normal after dinner, but then became more confused and developed a fever.  Id. at 156; 1310. His mental status deteriorated in the morning, and there was concern for hepatic encephalopathy. Id.  His examination showed emphysematous cystitis [infection of the bladder wall], gallstones, cirrhosis, ascites, and splenomegaly [enlarged spleen].  Id. at 127; 1380.  In addition, his blood

cultures "grew E coli," id. at 127; 1305, which would require fourteen days of treatment. Id. at 155; 1305. Decedent developed sepsis at this time due to his urinary tract infection, which was caused by E coli. Id. at 1305. It was noted that the fixation device "did not look infected," and would be left in place for several more weeks. Id. at 155; 1305. It was also noted that decedent "appears well-developed and obese and chronically ill." Id. at 1315. Decedent was discharged on January 25 in "good condition" with cephalexin for antibiotic coverage, but with diagnoses of sepsis due to a urinary tract infection that was due to E coli, metabolic encephalopathy, type 2 diabetes mellitus, renal transplantation with ESRD [end stage renal disease], cirrhosis due to NASH [nonalcoholic steatohepatitis], and scrotal edema. Id. at 155-56; 1305-06. He was readmitted to the nursing home. Id. at 327; 1306.

Thereafter, he was again admitted to the hospital on February 15. Id.; 1391. He was originally admitted for surgical exploration with cultures from the draining wound, and was monitored for sepsis. Id. at 223; 1392. He underwent removal of the hardware in his left leg on March 9. Id. at 127, 157-58; 1420. His leg was then amputated on March 22 "to prevent the progressive sepsis." Id. at 106-07; 1494. After amputation, it was shown that he had cellulitis. Id. at 127; 2041. The medical report shows that decedent had an "open infected wound," presumably of the left leg. Id. at 107;1494. The medical records also show the presence of cirrhosis, ascites, mild splenomegaly, and "generous fluid in the pelvis." Id. at 1020.

Decedent died in the hospital on April 10. Id. at 1391. Decedent's death certificate shows the immediate cause of death as sepsis, and cellulitis of the leg as leading to the cause of death. Id. at 2774. Decedent was sixty-one years old at the time of his death. Id. at 156, 2774.

## C.  Administrative Claim History

Plaintiff submitted her claim for benefits to Zurich, which was received on May 2, 2017.  Id.

at 2772.  After conducting its investigation, Zurich denied plaintiff's claim on December 29, 2017.

Id. at 112.  Zurich determined that there was no Covered Loss, because decedent

> had an extensive past history of multiple medical problems including several
> conditions that place him at high risk for infections.  He had diabetes, cirrhosis, renal
> failure and was on dialysis.  His past kidney transplant including treatment with
> several immunosuppressant medications and peripheral vascular disease with a
> history of chronic venous hypertension with ulceration also contributed to his death.
> He also had several instances of severe infection.  His death certificate states his
> cause of death was sepsis and cellulitis of the leg and his death was ruled as natural.
>
> We sent the medical records out for an independent medical review to Dr. Alfred
> Habel.  According to Dr. Habel, your husband's death was contributed to by his pre-
> existing diseases.  His significant past medical problems are significant contributory
> factors to the sepsis that led to his death.  His death was not independent of all other
> causes.  We then sent the report to the attending physician Dr. Robert Hauger for
> comment.  Since we did not receive a response, we sent the records out for another
> independent review to Dr. Jeffrey Danzig.  Dr. Danzig states that [decedent] did not
> die from a covered injury independent of all other causes.  He states that his co-
> morbidities contributed to his death.

Id. at 113-14.  In its denial of benefits, Zurich stated that it reviewed: the claim form; the Policy;

decedent's death certificate; a statement from Dr. Hauger; records from Drs. Hood, Dadgar, Calder,

Schmidt, and Hill; records from the Warren Clinic; records from St. Francis Hospital and the

Southern Hills Village nursing home; disability records; and independent medical evaluations by

Drs. Habel and Danzig.  Id. at 113.

Plaintiff appealed Zurich's decision on February 23, 2018, within the sixty-day time frame

for appeal.  Dkt. # 78, at 12.  For the appeal, plaintiff hired her own independent medical reviewer,

J. Clark Bundren, M.D.  Dkt. # 55, at 105-06.  Dr. Bundren opined that decedent died "as a direct

result of th[e] accident," but that his amputation "failed to prevent the progressive sepsis and

9

subsequent demise of [decedent] – as a result of the accident." Id. at 106. Zurich affirmed its denial

of plaintiff's claim on April 17, 2018. Id. at 95-98. Zurich's reasons for denying the appeal were

as follows:

> The death certificate indicates that the immediate cause of [decedent's] death was Sepsis secondary to Cellulitis of the Leg on April 10, 2017.
>
> We sent the medical records for an independent medical review and sought two different opinions by Dr. Alfred Habel, a Critical Care Specialist and Dr. Jeffrey Danzig, Internist, both of whom agree that significant prior medical conditions including but not limited to complications of End-Stage Renal Disease (ESRD), diabetes and cirrhosis contributed to [decedent's] death. It was further concluded that a history of immunosuppresive medications, which suppressed his ability to defend his body from infections, put him at a higher risk due to a weakened immune system.
>
> [Decedent] did not pass away as the result of a Covered Injury or Covered Loss as the death was not caused by an accident independent of all other causes. In addition to the definitions precluding coverage, the claim is excluded as the death was caused, contributed to or resulted from illness. These co-morbidities contributed to [decedent's] demise and as a result, the death was not due solely to Covered Loss or Covered Injury as defined in the policy.

Id. at 96.

Plaintiff sent a letter to Zurich on June 18, 2018, asking for clarification as to denial of her

dismemberment claim. Id. at 92-93; Dkt. # 81-1, at 7. The parties dispute whether Zurich ever

responded to this letter. Id.; Dkt. # 78, at 12.

### D. Plaintiff's Attempted Supplement to the Record

On August 28, 2019, the Court entered an order granting in part plaintiff's request for

additional discovery in the form of interrogatories. Dkt. # 62. Once she received answers to these

interrogatories, plaintiff filed a sealed "supplement to the administrative record" (Dkt. # 72), which

includes Zurich's limited answers to interrogatories (Dkt. # 72-1), and Zurich's ERISA Committee

Protocols (Dkt. # 72-2). Plaintiff also filed an additional sealed "document for administrative

record" (Dkt. # 75), which is the Zurich Way Best Practices for A&H Corporate Accident. Dkt. # 75.

The Court would not consider these documents in a substantial evidence review, because the parties represented that only the records in the administrative record (Dkt. # 55) were available to Zurich at the time of its denial of benefits. The Court could consider these documents in its de novo review, see Hall v. UNUM Life Ins. Co. of America, 300 F.3d 1197, 1202 (10th Cir. 2002) (court may supplement administrative record in de novo review only "when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision.") (citation omitted); Murphy v. Deloitte & Touche Group Ins. Plan, 619 F.3d 1151, 1159 (10th Cir. 2010) ("In this context, a general prohibition on extra-record supplementation makes sense."); however, the Court finds that these documents are irrelevant because the only question before the Court in its de novo review is whether Zurich's review of denial of benefits was reasonable and not arbitrary or capricious. These supplemental documents not in the administrative record establish only that Zurich may have not followed best practices in training their employees as to "date of loss," which, as addressed below, does not establish anything under the Policy.[2] See IV., infra. However, the Court does not address this alleged failure to train because the supplemental documents, by their terms, do not mandate that Zurich instruct its employees as to "date of loss."

---

[2] Indeed, the only reference to "date of loss" in the supplemental documents appears on the bottom of one page of Zurich Way Best Practices for A&H Corporate Accident. Dkt. # 75, at 6. However, this term is defined in neither that document nor the Policy.

**E.  This Lawsuit**

On December 21, 2018, plaintiff filed this lawsuit against both defendants, seeking unpaid benefits and attorney fees.  Dkt. # 2.  WPX filed a motion for judgment on the pleadings on May 16, 2019 (Dkt. # 46), which the Court denied on June 12, 2019.  Dkt. # 52.  On November 25, 2019, plaintiff filed her opening brief asking for summary judgment against both defendants.  Dkt. # 78. Zurich filed a response, seeking summary judgment on its behalf.  Dkt. # 81.  Plaintiff then filed a reply.  Dkt. # 84.

Plaintiff argues that, despite "Date of Loss" correspondence and internal documentation, Zurich failed to instruct its reviewing doctors to look at contributing factors to the December 17 fall but, rather, instructed them to look at contributing factors to decedent's death only; that decedent was not treated for illnesses or diseases after the fall, which, plaintiff argues is the "Covered Loss" (defined below) because of "Date of Loss" correspondence; that "Date of Loss" correspondence and internal documentation caused plaintiff to rely on the fall as being a "Covered Loss"; that the independent medical doctor evaluations constitute inadmissible hearsay; that "pre-existing conditions" cases support plaintiff's position; and that Zurich failed to investigate her dismemberment claim.  Dkt. ## 78, at 7, 16-17, 19, 24, 27; 84, at 3-7.

## II.

## Standard of Review

As an initial matter, the Court's scheduling order (Dkt. # 77) directed the parties to file opening, response, and reply briefs.  Both parties filed their pleadings as motions for summary judgment.  See Dkt. ## 78, 81.  However, the law is clear that the reviewing court does not apply the

Rule 56 summary judgment standard in an ERISA case.[3] See Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002) (holding that summary judgment is not the proper standard of review in an ERISA case, because "trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court"); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 101 (1989) (proper standard of review is de novo). Therefore, the Court will proceed to review this case de novo, subject to Zurich's conflict of interest, as discussed below.

As a plan beneficiary, plaintiff has the right to federal court review of benefit denials and terminations under ERISA. "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans." Firestone, 489 U.S. at 113. Specifically, 29 U.S.C. § 1132(a)(1)(b) grants plaintiff the right "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The default standard of review is de novo. However, when a plan gives the claims administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a challenge under section 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard. See Firestone, 489 U.S. at 115 (courts must apply the appropriate standard "regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest. Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.").

---

[3]    Plaintiff acknowledge this in her reply brief. See Dkt. # 84, at 1.

Under the two-tier "sliding scale" approach adopted by the Tenth Circuit, a "reduction in deference is appropriate" where there is an inherent or proven conflict of interest. <u>Fought v. UNUM Life Ins. Co. Of America</u>, 379 F.3d 997, 1006 (10th Cir. 2004) (per curiam), <u>abrogated</u> <u>in</u> <u>part</u> <u>on other</u> <u>grounds</u> <u>by</u> <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 116 (2008). If plaintiff shows an inherent or proven conflict of interest, deference to the decision is reduced and the burden shifts to the plan administrator or fiduciary to prove "that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." <u>Id.</u> However, if the plan administrator operates under a "standard" conflict of interest, the conflict of interest is simply "one factor in determining whether the plan administrator's denial of . . . benefits to plaintiff was arbitrary and capricious." <u>Id.</u> at 1005. When an employer establishes a self-funded benefits plan and serves as the plan administrator or fiduciary, this is a standard conflict of interest rather than an inherent conflict of interest. <u>Wolberg v. AT&T Broadband Pension Plan</u>, 123 Fed. App'x 840, 845 (10th Cir. Jan 6, 2005)[4]; <u>Slocum v. UNUM Life Ins. Co. of America</u>, 2007 WL 2461690, *4 n.1 (D. Kan. Aug. 28, 2007). To determine the severity of the conflict of interest, a court should consider four factors:

> (1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan.

<u>Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan</u>, 379 F.3d 1168, 1175 (10th Cir. 2004) (quoting <u>Kimber v. Thiolkol</u>, 196 F.3d 1092, 1098 (10th Cir. 1999)).

---

[4]    Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1: 10th Cir. R. 32.1.

The parties agree that the "sliding scale" approach is applicable. Dkt. ## 78, at 14-16; 81, at 2-3. The Court will now analyze the four <u>Finley</u> factors to determine the severity of the conflict of interest and whether it is a standard conflict of interest or an inherent conflict of interest. It appears from the large loss report that Zurich is the company providing the funds for the Plan rather than WPX. Zurich originally posted reserves for $1,000,000, but then reduced reserves to $10 on October 10, 2017. Dkt. # 55, at 109. There is no evidence that WPX funded the Plan. Thus, it is not "self-funded." Second, it appears from the administrative record that the company funding the Plan, Zurich, appointed and compensated the Plan administrator. All employees reviewing decedent's coverage are employees of Zurich. Thus, the second factor demonstrates a conflict of interest. As to the third factor, there is no evidence that the administrator's performance reviews or level of compensation were linked to the denial of benefits. Similarly, there is no evidence as to the fourth factor. The conflict of interest in Zurich's review of the Plan is severe because it funded the plan and reviewed the denial of benefits. However, it is an inherent or proven conflict of interest, rather than a standard conflict of interest, because it does not appear to be self-funded. Therefore, the burden shifts to Zurich to prove "that its interpretation of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." <u>Fought</u>, 379 F.3d at 1006.

"'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.'" <u>Sandoval v. Aetna Life & Cas. Inc. Co.</u>, 967 F.2d 377, 382 (10th Cir. 1992) (citations omitted). "The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned

application of the terms of the plan to the particular case, untainted by the conflict of interest."
Allison v. Unum Life Ins. Co. of America, 381 F.3d 1015, 1022 (10th Cir. 2004). The Court considers the record as a whole, but it considers only that information available to the plan administrator at the time the decision was made. Hall v. Unum Life Ins. Co. of America, 300 F.3d 1197, 1201 (10th Cir. 2002); Chambers v. Family Health Plan Corp., 100 F.3d 818, 823 (10th Cir. 1996) ("The reviewing court may consider only the evidence that the administrators themselves considered."). The Court must "take into account whatever in the record fairly detracts from the weight of the evidence in support of the administrator's decision." Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994) (internal citations and quotation marks omitted). The Court gives less deference to an administrator's conclusions if the administrator fails to gather or examine relevant evidence. See Caldwell v. Life Ins. Co. of N. America, 287 F.3d 1276, 1282 (10th Cir. 2002). Yet, the Court "will not set aside a benefit decision if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co., Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).

## III.

### Substantial Evidence Analysis

#### A.  No "Covered Loss"

The relevant language of the Policy is:

### SECTION III - DEFINITIONS

**Accident** or **Accidental** means a sudden, unexpected, specific and abrupt event that occurs by change at an identifiable time and place during the **Policy** term.

. . .

**Covered Accident** means an **Accident** that results in a **Covered Loss**.

**Covered Injury** means an **Injury** directly caused by accidental means which is independent of all other causes, results from a **Covered Accident**, occurs while the **Covered Person** is insured under this **Policy**, and results in a **Covered Loss**.

**Covered Loss** means a loss which meets the requisites of one or more benefits or additional benefits, results from a **Covered Injury**, and for which benefits are payable under this **Policy**.

. . .

Dkt. # 55, at 14.

Benefits are payable under the Policy only for a "Covered Loss." <u>Id.</u> at 14. To be a "Covered Loss," there must first be a "Covered Injury," which is defined as an "**Injury** directly caused by accidental means <u>which is independent of all other causes</u> . . . and results in a **Covered Loss**." <u>Id.</u> (emphasis added). Decedent's fall may have been accidental, but his dismemberment and death (either of which plaintiff argues is the "Covered Loss") were not a direct result of the fall.

Decedent's medical records overwhelmingly support this finding. Decedent had been treated (and was continually treated even after the fall) for numerous, serious illnesses. Decedent had a kidney transplant in 2005, and was diagnosed with cirrhosis as early as 2013. <u>Id.</u> at 148, 512, 647. He was diagnosed with diabetes, renal failure, intermittent diarrhea, "profound anemia," he was chronically immunosuppressed from the kidney transplant, he had brain inflammation due to cirrhosis and abnormal buildup of fluid in his abdomen, a urinary tract infection leading to "acute hepatic encephalopathy" (and the sepsis which killed decedent), peripheral vascular disease, coronary artery disease, and he was on dialysis. <u>Id.</u> at 146-52. In addition, he was diagnosed with "life-threatening hyperkalemia." <u>Id.</u> at 152. After the fall, decedent was diagnosed and treated for having

"type 2 diabetes mellitus, morbid obesity[,] and coronary artery disease" and was treated for these diseases.  Id. at 154.  These diseases make decedent's death and dismemberment not "independent of all other causes" other than the fall.

Finally, the death certificate, the claim form, and the independent medical reviewers all state that decedent died of sepsis and cellulitis.  Id. at 128, 156, 2774, 2777.  On April 22, 2017, plaintiff filled out a claim form, which was received by Zurich on May 2, 2017.  Id. at 2772-78.  On the claim form, plaintiff included the date of the fall, the time of the fall, the cause of the fall, and the result of the fall.  Id. at 2776.  She listed all of decedent's physicians.  Id.  She noted that he was on LTD. Id.  She noted that he had liver and kidney disease with some heart blockage.  Id.  She claimed $1,088,710 (including $1,000,000 death coverage).  Id.  In the statement by the attending physician, it was noted that decedent died primarily from sepsis, and that the sepsis was "from skin infection." Id. at 2777.  The death certificate lists the causes of death as sepsis secondary to cellulitis of the leg. Dkt. # 55, at 2774.  The certificate does not find or mention the fall on December 17, 2016, as the cause of decedent's death and dismemberment.

The two independent medical evaluators both opined that decedent died from sepsis, contributed to by his pre-existing conditions.  First, Dr. Habel noted the circumstances surrounding decedent's injury, and decedent's previous diagnoses.  Id. at 145-53.  He also noted that, after decedent's initial surgery, decedent developed sepsis and was admitted to the hospital on January 17, 2017.  Id. at 155.  He finally noted that the cause of decedent's death on April 10, 2017, was "progressive sepsis due to bullous cellulitis of the right leg.  Additional diagnoses included cirrhosis due to nonalcoholic steatohepatitis, type 2 diabetes mellitus, end stage renal disease, renal transplant, infected hardware in the left knee necessitating amputation above the left knee and colostridium

difficile colitis." <u>Id.</u> at 156. The second independent medical evaluator, Jeffrey B. Danzig, M.D., opined that decedent died indirectly from the fall "based on the fact that he developed infectious complications from the surgery required to treat his leg. However, it is highly likely that his comorbidities, including cirrhosis and ESRD created a milieu in which post-operative complications were more likely and more severe." <u>Id.</u> at 128.

Sepsis, cellulitis, and all of the illnesses and diseases with which decedent's treating physicians diagnosed decedent do not make decedent's death and dismemberment "independent of all other causes" other than the fall. The Court thus finds in its <u>de novo</u> review that Zurich's decision to deny plaintiff benefits is not only supported by substantial evidence, but it is also overwhelmingly supported. The Court finds no medical evidence contradicting Zurich's determination that there is no "Covered Loss" because decedent's death and dismemberment were not independent of all causes other than the fall. Therefore, Zurich did not act arbitrarily or capriciously in denying plaintiff's claim for benefits as to "Covered Loss."

**B. The "Illness or Disease" Exclusion Applies**

In addition to the definitions section of "Covered Loss," the Policy contains an illness or disease exclusion, which provides:

**SECTION VII - GENERAL EXCLUSIONS**

A loss will not be a **Covered Loss** if it is caused by, contributed to, or results from:

. . .

4. illness or disease, regardless of how contracted; medical or surgical treatment of illness or disease; or complications following the surgical treatment of illness or disease . . .

Id. at 21.

The illness or disease clause excludes the death or dismemberment of decedent from being a "Covered Loss" in this case. The Policy states that "A loss will not be a **Covered Loss** if it [is] caused by, <u>contributed to</u>, or results from: . . . 4. illness or disease, regardless of how contracted; medical or surgical treatment of illness or disease; or complications following the surgical treatment of illness or disease . . . . Dkt. # 55, at 21 (emphasis added). Renal failure, intermittent diarrhea, "profound anemia," being chronically immunosuppressed from a 2005 kidney transplant, inflammation due to cirrhosis and abnormal buildup of fluid in the abdomen, a urinary tract infection leading to acute hepatic encephalopathy, peripheral vascular disease, type 2 diabetes mellitus, morbid obesity, and coronary artery disease are "illnesses or diseases" that contributed to decedent's death and dismemberment.

Further, sepsis and cellulitis themselves are illnesses or diseases that <u>caused</u> (not merely contributed to) decedent's death. Courts have ruled in favor of the insurer in other cases where sepsis caused the decedent's death. <u>See</u>, <u>e.g.</u>, <u>Davis v. Fed. Ins. Co.</u>, 382 F. Supp. 3d 1189, 1198 (W.D. Okla. April 8, 2019) ("The uncontested cause of Ms. Mosley's death–sepsis stemming from a bacterial infection–plainly shows that her death was not independent of an illness, disease, or bodily malfunction."); <u>Akin v. Unimerica Ins. Co.</u>, 2010 WL 5157181, at *6 (S.D. Ohio Dec. 14, 2010) (plan administrator did not arbitrarily or capriciously deny plaintiff's claim because sepsis and end stage renal disease contributed to the beneficiary's death); <u>Thomas v. AIG Life Ins. Co.</u>, 244

F.3d 368 (5th Cir. 2001) (affirming the plan administrator's denial of benefits because complications from surgery was the cause of the beneficiary's death).

The Court finds in its <u>de novo</u> review that Zurich's determination that there is no "Covered Loss," because the illness or disease exclusion applies is supported by all the medical evidence. Therefore, Zurich did not act arbitrarily or capriciously in denying plaintiff's claim for benefits by applying the illness or disease exclusion.

**IV.**

**Plaintiff's Arguments**

The majority of plaintiff's arguments rests on Zurich's internal documentation and communications with plaintiff and Zurich's reviewing doctors stating that the "Date of Loss" was December 17. Dkt. # 78, at 16-25. Plaintiff has three related arguments along these lines. First, that Zurich ignored its own determination of "Date of Loss" by instructing its reviewing physicians to look only at contributing factors to decedent's death, rather than the December 17 fall. <u>Id.</u> at 16-18. Second, that decedent was not treated for any illnesses or diseases after the December 17 fall (again, which Zurich allegedly admitted was the "Date of Loss"). <u>Id.</u> at 18-20. Third, plaintiff argues that she relied on Zurich's determination of "Date of Loss," and, further, that Zurich failed to train its employees on "Date of Loss" versus "Date of Accident." <u>Id.</u> at 23-25.

Plaintiff argues that Zurich abused its discretion "by ignoring its own determination of the date of loss." Dkt. # 78, at 16. Plaintiff argues that, in Zurich's internal documents and communications, Zurich originally referenced "Date of Loss" as December 17 (the date of decedent's fall). <u>Id.</u> at 17. But thereafter, Zurich suddenly changed "Date of Loss" to "Date of Accident" in its

correspondence and internal documentation. Id. at 22. Plaintiff argues that, in line with this, Zurich failed to instruct the reviewing doctors to look at factors contributing to the December 17 fall but, rather, instructed them to look at factors contributing to decedent's death only. Dkt. # 78, at 21. However, plaintiff is entitled to no benefits under the Policy for the fall itself, because decedent did not die or become dismembered during the fall or independent of other causes. Therefore, Zurich need not have instructed the doctors to look at factors contributing to the fall.[5]

Plaintiff argues that there is no evidence that decedent was treated for his illnesses and diseases after the fall. Dkt. # 78, at 19. However, the record is replete with medical records of decedent's treatment for illnesses and diseases after the fall. See, e.g., Dkt. # 55, at 1845-46 (demonstrating that decedent required cardiology consultation); 2675 (showing decedent on dialysis and diabetic insulin after the fall); 1393, 1341 (noting that decedent developed clostridium difficile while at the nursing home and was treated with Vancomycin); 1305 (indicating decedent was treated for fourteen days for E coli and other illnesses and diseases developed before or after the fall); 1835-36 (showing decedent being prescribed fourteen medications, including cetirizine (used to treat allergies), furosemide (used to treat heart failure, liver disease, and kidney disease), and lantus solostar (for low insulin levels due to diabetes); see also id. at 1839 (showing Dr. Zandi's concern for decedent's coronary disease and plan to "consult nephrology").

Plaintiff argues that the terms of the Policy are ambiguous because "Date of Loss" and "Date of Accident" are not defined terms, and Zurich used these terms in its communications, causing plaintiff to rely on these terms. Dkt. # 84, at 5; Dkt. # 78, at 20-25. Plaintiff argues that this

---

[5]       Further, Dr. Habel provided a detailed account of decedent's medical history leading up to the fall, even without being instructed to do so. See Dkt. # 55, at 146-53.

"ambiguity" in the Policy should be interpreted in her favor.  Id. at 20.  However, the Policy is not ambiguous; all relevant terms are defined, and they are in bold throughout the Policy.  For example, in the definitions section, the Policy states that a "**Covered Injury** means an **Injury** <u>directly caused by accidental means which is independent of all other causes</u>, results from a **Covered Accident**, occurs while the **Covered Person** is insured under this **Policy**, and results in a **Covered Loss**."  Dkt. # 55, at 14.  The Tenth Circuit has held that the words "directly and independently of all other causes" are not ambiguous.  <u>Pirkheim v. First Unum Life Ins.</u>, 229 F.3d 1008, 1010 (10th Cir. 2000). In regard to plaintiff's argument about her reasonable expectations, the Tenth Circuit held that, in the absence of ambiguous language in an insurance contract, policy language will not be interpreted liberally to meet the reasonable expectations of the intended beneficiaries.  <u>Id.</u> at 1011.  Therefore, plaintiff's "reliance" argument is misplaced.  The Court finds that the terms in the Policy are clear and stated in plain English; they are not ambiguous.  "Date of loss" is not a defined term, it is not in bold, and it appears only a few times in the Policy.[6]  It is never associated with loss benefits; therefore, it has no significant meaning as to the coverage decision here.  Plaintiff's argument that Zurich failed to train its employees as to important dates, <u>see</u> <u>id.</u> at 24, is likewise meritless: there is no reason Zurich should train its employees as to non-decisional terms like "Date of Loss."

Plaintiff argues in her reply brief that Zurich's independent medical reviewer reports constitute inadmissible hearsay.  Dkt. # 84, at 4.  However, the law is clear that insurance companies may consult independent medical examiners in their review of benefits.  <u>See</u> <u>Rizzi v. Hartford Life and Acc. Inc. Co.</u>, 383 Fed. App'x 738, 751 (10th Cir. 2010) ("Hartford's reliance on independent

---

[6]     For example, one of the few times "date of loss" appears is in the "Day Care Benefit" section.  <u>See</u> Dkt. # 55, at 18.

physicians to review her benefits claim was not unreasonable or an abuse of its discretion.").

Therefore, Zurich acted within its discretion in consulting its independent medical reviewers'

opinions. Further, this is not a trial; this is a review of denial of benefits. Therefore, the laws of

evidence, i.e., hearsay, do not apply. Further, plaintiff hired her own independent medical reviewer,

Dr. Bundren, who opined on February 15, 2018, that decedent died as a direct result of the fall, but

also that his amputation "failed to prevent the progressive sepsis and subsequent demise of

[decedent] . . . ." Dkt. # 55, at 105-06. Dr. Bundren's opinion that decedent's death was a "direct

result" of the fall is a conclusion without consideration or application of the plain language of the

Policy. Dr. Bundren treats decedent's death as "caused" by the fall. However, this is not a

negligence case, where proximate causation is the issue; this case is about the plain language of an

unambiguous Policy. Further, Dr. Bundren does not state that he reviewed the Policy, nor does he

address the Policy language. Therefore, Dr. Bundren's conclusion that decedent died as a direct

result of the fall is unhelpful in reviewing Zurich's denial of benefits. Dr. Budren's opinion that

decedent's "progressive sepsis" contributed to decedent's death, however, does support Zurich's

denial of benefits. As discussed above, applying the plain language of the Policy, decedent's death

and dismemberment were not independent of all other causes because sepsis caused decedent's

death. Further, the illness or disease exclusion prevents plaintiff's loss from being a "Covered Loss"

because sepsis caused decedent's death.

Plaintiff argues that "pre-existing conditions" cases support her position that her loss was a

"Covered Loss." Dkt. # 78, at 26-27; Dkt. # 84, at 5-6. Plaintiff cites Fought v. UNUM Life Ins.

Co. of Am., 379 F.3d 997 (10th Cir. 2004), and Vander Pas v. UNUM Life Ins. Co. of Am., 7 F.

Supp. 2d 1011 (E.D. Wis. 1998). Dkt. # 84, at 5-6. However, both of these cases involve pre-

existing condition clauses in group long-term disability plans. There is no pre-existing condition clause in Zurich's Policy. Rather, Zurich's Policy includes an "independent of all other causes" clause and an illness or disease exclusion clause. Courts have affirmed plan administrators' denial of benefits in cases similar to this. See, e.g., Davis, 382 F. Supp. 3d at 1198 ("The uncontested cause of Ms. Mosley's death–sepsis stemming from a bacterial infection–plainly shows that her death was not independent of an illness, disease, or bodily malfunction.").

Finally, plaintiff argues that Zurich failed to investigate her dismemberment claim. Dkt. # 78, at 27. However, as discussed above, plaintiff's dismemberment claim is also not a "Covered Loss." The medical records discussed at length above support that conclusion. Whether Zurich investigated the dismemberment claim or only the death claim is also immaterial: Zurich addressed plaintiff's death benefits claim only, because that was the claim she made, and the amounts do not cumulate.

## V.

### Conclusion

Zurich's decision to deny plaintiff benefits is not only supported by substantial evidence; it is supported by overwhelming evidence. The Court concludes that the Policy is unambiguous, that decedent did not die or become dismembered "independent of all other causes" other than the fall, that the illness or disease exclusion applied to plaintiff's claim for benefits, and that Zurich did not err in denying death and dismemberment benefits to plaintiff. The Court has reviewed de novo the administrative record, considered plaintiff's arguments, given reduced deference to Zurich due to

its conflict of interest, and finds that Zurich's decision to deny plaintiff benefits should be affirmed as neither arbitrary nor capricious.

**IT IS THEREFORE ORDERED** that defendant Zurich American Insurance Company's denial of plaintiff's claim for accidental death and dismemberment benefits cannot be labeled unreasonable, unsupported, or contrary to the clear weight of the administrative record. The ensuing denial of benefits was, therefore, neither arbitrary nor capricious. A separate judgment for defendants is entered herewith.

**DATED** this 5th day of February, 2020.

_Claire V Eagl_
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE